**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | ) ) ) ) ) | Master File No, 12-md-02311 Honorable Marianne O. Battani |
| _____ | ) | |
| In Re: | ) ) | |
| *AUTOMOTIVE WIRE HARNESSES* CASES | ) ) ) | **Jury Trial Demanded** |
| _____ | ) ) | |
| THIS RELATES TO: | ) ) | Case No. _____ |
| GROUP 1 AUTOMOTIVE, INC. AS ASSIGNEE ON BEHALF OF GROUP 1 AUTOMOTIVE WHOLLY-OWNED SUBSIDIARY DEALERSHIPS, ASBURY AUTOMOTIVE GROUP, INC. AS ASSIGNEE ON BEHALF OF ASBURY AUTOMOTIVE WHOLLY-OWNED SUBSIDIARY DEALERSHIPS, VAN TUYL GROUP, LLC AS ASSIGNEE ON BEHALF OF ASSIGNOR DEALERSHIPS, AND MAJOR AUTOMOTIVE COMPANIES, INC. AS ASSIGNEE ON BEHALF OF MAJOR AUTOMOTIVE WHOLLY-OWNED SUBSIDIARY DEALERSHIPS, BRONX FORD, INC., AND CITY WORLD MOTORS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs. | ) ) | |
| v. | ) ) | |
| DENSO CORP., DENSO INTERNATIONAL AMERICA, INC., FUJIKURA, LTD., FUJIKURA AUTOMOTIVE AMERICA LLC, | ) ) ) ) | |

FURUKAWA ELECTRIC,                          )
AMERICAN FURUKAWA, INC.,                     )
LEAR CORPORATION,                           )
KYUNGSHIN-LEAR SALES AND                     )
ENGINEERING, LLC,                           )
LEONI WIRING SYSTEMS, INC.,                  )
LEONISCHE HOLDING, INC.,                     )
SUMITOMO ELECTRIC INDUSTRIES, LTD.,)
SUMITOMO WIRING SYSTEMS, LTD.,               )
SUMITOMO ELECTRIC WIRING SYSTEMS,)
INC.,                                       )
K&S WIRING SYSTEMS, INC.,                    )
SUMITOMO WIRING (U.S.A.) INC.,               )
YAZAKI CORPORATION,                         )
YAZAKI NORTH AMERICA, INC.,                  )
TRAM, INC.,                                 )
ROKAI RIKA CO., LTD.,                        )
G.S. ELECTECH, INC.,                         )
G.S.W. MANUFACTURING, INC.,                  )
MITSUBISHI ELECTRIC CORPORATION,             )
MITSUBISHI ELECTRIC US HOLDINGS,             )
INC.,                                       )
MITSUBISHI ELECTRIC AUTOMOTIVE               )
AMERICA, INC.,                              )
ASTI CORPORATION,                           )
CHIYODA MANUFACTURING                        )
CORPORATION,                                )
AND CHIYODA USA CORPORATION,                 )
                                            )
                Defendants.                  )

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Group 1 Automotive, Inc. as Assignee on Behalf of Group 1 Automotive Wholly-owned Subsidiary Dealerships, Asbury Automotive Group, Inc. as Assignee on Behalf of Asbury Automotive Wholly-owned Subsidiary Dealerships, Van Tuyl Group, LLC as Assignee on Behalf of Assignor Dealerships, and  Major Automotive Companies, Inc. as Assignee on Behalf of Major Automotive Wholly-owned Subsidiary Dealerships, Bronx Ford, Inc., and City World Motors, LLC (collectively, "Plaintiffs") file this Original Complaint (the

"Complaint"), on behalf of themselves, against Defendants Denso Corp., Denso International America, Inc., Fujikura, Ltd., Fujikura Automotive America LLC, Furukawa Electric, American Furukawa, Inc., Lear Corporation, Kyungshin-Lear Sales and Engineering, LLC, Leoni Wiring Systems, Inc., Leonische Holding, Inc., Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc., Sumitomo Wiring (U.S.A.) Inc., Yazaki Corporation, Yazaki North America, Inc., TRAM, Inc., Rokai Rika Co., Ltd., G.S. Electech, Inc., G.S.W. Manufacturing, Inc., Mitsubishi Electric Corporation, Mitsubishi Electric US Holdings, Inc., Mitsubishi Electric Automotive America, Inc., Asti Corporation, Chiyoda Manufacturing Corporation, and Chiyoda USA Corporation (collectively, "Defendants").  For their Complaint, Plaintiffs state as follows:

## I.  NATURE OF ACTION

1.      The global conspiracy to fix the prices of various automotive parts in violation of multiple countries' antitrust laws has resulted in the "biggest criminal antitrust investigation that [the Department of Justice has] ever encountered…with respect to the impact on U.S. business and consumers, and the number of companies and executives that are subject to the investigation."[1]   The United States alone has levied billions of dollars in fines and multiple companies and executives have pled guilty to various antitrust charges.  Dozens of civil lawsuits have been filed as well, including several class actions from both direct purchaser and indirect purchasers of dozens of automotive parts.  This action concerns the conspiracy to unlawfully fix the prices of "Automotive Wire Harnesses" and the substantial harm that conspiracy has caused Plaintiffs, who comprise some of the largest groups of automobile dealerships in the country.

2.      Automobiles include various electronics.   The electronics control various

---

[1] https://www.law360.com/articles/416139/doj-widens-antitrust-probe-into-auto-parts-industry.

functions ranging from basic operating functions to luxury, safety, and comfort features. Automotive Wire Harnesses are electrical distribution systems used to direct and control those electronics. They are composed of wires, cables, and/or data circuits. They "are the 'central nervous systems' of automotive vehicles and consist of wires or cables and data circuits that run throughout the vehicles." Dkt. No. 99 at 4. Automotive Wire Harnesses provide the mechanism for transmitting power and signals throughout an automobile to its various electronics. One of the Defendants, Yazaki, describes Automotive Wire Harnesses on its website as "similar to the spinal cord found within the body – distributing electricity and information throughout the vehicle to other components."

3.      Automotive Wire Harnesses also organize and bind the massive amounts of wiring that spread through automobiles to support their electronic systems. For example, the systems use color coded wires to identify which wires support which electronic feature. Automotive Wire Harnesses are designed to not only organize a vehicle's wiring system but also protect it from various types of damage.

4.      In short, Automotive Wire Harnesses are essential components of nearly every modern automobile. As explained further below, Defendants control the vast majority of the market and, therefore, were able to engage in a massive price-fixing conspiracy against nearly the entire global automotive industry for several years. Defendants' conduct raised the prices of vehicles containing Automotive Wire Harnesses and replacement Automotive Wire Harnesses. The harm Defendants intentionally caused to Plaintiffs and others is substantial and constitutes an antitrust injury under both federal and state laws as set forth below.

5.      Plaintiffs bring this action to recover for this harm for Automotive Wire Harnesses and/or vehicles containing Automotive Wire Harnesses purchased by Plaintiffs,

manufactured by Defendants or any co-conspirator, during the period from January 1, 1998 to the present (the "Relevant Time Period").

## II. JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Section 16 of the Clayton Act (15 U.S.C. §26), Section 1 of the Sherman Act (15 U.S.C. §1), and 28 U.S.C. §§1331 and 1337.  This Court has subject matter jurisdiction over the state law claims in this action pursuant to 28 U.S.C. §§1332(a) and 1367 as Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. §22), and 28 U.S.C. §§1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

8.     This Court has jurisdiction over each Defendant because each either directly or through the ownership and/or control of its United States subsidiaries:  (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Automotive Wire Harnesses designed for vehicles to be sold throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; (d) colluded with conspirators who engaged in conspiratorial conduct in the United States, including in this district; and/or (e) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in,

located in, or doing business throughout the United States. Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States and this district.

9.      Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States, and upon import trade and commerce within the United States.

10.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

11.     Automotive Wire Harnesses manufactured abroad by Defendants and sold for use in automobiles either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any Automotive Wire Harnesses are purchased in the United States, and such Automotive Wire Harnesses do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs in the United States.

12.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs. Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Automotive Wire Harnesses, and that conspiracy unreasonably restrained trade and adversely

6

affected the market for Automotive Wire Harnesses.

13.     Defendants' conspiracy and wrongdoing injured Plaintiffs who indirectly purchased Automotive Wire Harnesses as replacement parts and vehicles containing Automotive Wire Harnesses.

### III. PARTIES

#### a. **Plaintiffs**

14.     Plaintiff Group 1 Automotive, Inc. as Assignee on Behalf of Group 1 Automotive Wholly-owned Subsidiary Dealerships is a Delaware corporation with its principal place of business in Houston, Texas.  The wholly-owned subsidiary dealerships identified on the attached Exhibit A have assigned their claims to Group 1 Automotive, Inc.  The dealerships are (or have been) authorized dealers for at least the following:  Audi, BMW, Buick, Chevrolet, Chrysler, Dodge, Ford, GMC, Honda, Hyundai, Infiniti, Jeep, Kia, Lexus, Lincoln, Mazda, Mercedes-Benz, Mini, Mitsubishi, Nissan, Plymouth, Pontiac, Porsche, Ram, Scion, Smart, Subaru, Suzuki, Toyota, Volkswagen, and Volvo.  Group 1 Automotive, Inc. as Assignee on Behalf of Group 1 Automotive Wholly-owned Subsidiary Dealerships (hereinafter, "Group 1 Automotive") purchases new vehicles containing Automotive Wire Harnesses manufactured by Defendants and/or replacement parts for Automotive Wire Harnesses manufactured by Defendants.  Group 1 Automotive purchased and received the Automotive Wire Harnesses and/or vehicles containing Automotive Wire Harnesses in the following states: California, Florida, Kansas, Massachusetts, Mississippi, New Hampshire, New Mexico, New York, and South Carolina.  Group 1 Automotive has also displayed, sold, serviced, and advertised its vehicles in those states during the Relevant Time Period.  Accordingly, Group 1 Automotive has been forced to pay Defendants' supra-competitive prices.  Group 1 Automotive, therefore, has been injured in its

business and/or property as a result of the unlawful conduct alleged herein.

15.     Plaintiff Asbury Automotive Group, Inc. as Assignee on Behalf of Asbury Automotive Wholly-owned Subsidiary Dealerships is a Delaware corporation with its principal place of business in Duluth, Georgia.  The wholly-owned subsidiary dealerships identified on the attached Exhibit B have assigned their claims to Asbury Automotive Group, Inc.   The dealerships are (or have been) authorized dealers for at least the following: Acura, Audi, BMW, Buick, Cadillac, Chevrolet, Chrysler, Daewoo, Dodge, Ford, GMC, Honda, Hyundai, Infiniti, Isuzu, Jaguar, Jeep, Kia, Land Rover, Lexus, Lincoln, Mazda, Mercedes-Benz, Mini, Mitsubishi, Nissan, Pontiac, Porsche, Toyota, Scion, Subaru, Suzuki, Volkswagen, and Volvo.  Asbury Automotive Group, Inc. as Assignee on Behalf of Asbury Automotive Wholly-owned Subsidiary Dealerships (hereinafter, "Asbury Automotive") purchases new vehicles containing Automotive Wire Harnesses manufactured by Defendants and/or replacement parts for Automotive Wire Harnesses manufactured by Defendants.   Asbury Automotive purchased and received the Automotive Wire Harnesses and/or vehicles containing Automotive Wire Harnesses in the following states:  Arkansas, California, Florida, Missouri, Mississippi, North Carolina, Oregon, and South Carolina.  Asbury Automotive has also displayed, sold, serviced, and advertised its vehicles in those states during the Relevant Time Period.  Accordingly, Asbury Automotive has been forced to pay Defendants' supra-competitive prices.  Asbury Automotive, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

16.     Plaintiff  Van Tuyl Group, LLC as Assignee on Behalf of Assignor Dealerships is a Delaware limited liability company with its principal place of business in Irving, Texas.  The assignor dealerships identified on the attached Exhibit C have assigned their claims to Van Tuyl Group, LLC.  The dealerships are (or have been) authorized dealers for at least the following:

Acura, Alpha Romeo, Audi, BMW, Buick, Cadillac, Chevrolet, Chrysler, Dodge, Fiat, Ford, GMC, Honda, Hyundai, Infiniti, Jeep, Kia, Lexus, Lincoln, Mazda, Nissan, Subaru, Toyota, Volkswagen, and Volvo.  Van Tuyl Group, LLC as Assignee on Behalf of Assignor Dealerships (hereinafter, "VTG") purchases new vehicles containing Automotive Wire Harnesses manufactured by Defendants and/or replacement parts for Automotive Wire Harnesses manufactured by Defendants.  VTG purchased and received the Automotive Wire Harnesses and/or vehicles containing Automotive Wire Harnesses in the following states:  Arizona, California, Florida, Illinois, Missouri, Nebraska, and New Mexico.  VTG has also displayed, sold, serviced, and advertised its vehicles in those states during the Relevant Time Period. Accordingly, VTG has been forced to pay Defendants' supra-competitive prices.  VTG, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

17.     Plaintiff Major Automotive Companies, Inc. as Assignee on Behalf of Major Automotive Wholly-owned Subsidiary Dealerships is a Delaware corporation with its principal place of business in Long Island City, New York.  The wholly-owned subsidiary dealerships identified on the attached Exhibit D have assigned their claims to Major Automotive Companies, Inc.  The dealerships are (or have been) authorized dealers for at least the following: Chevrolet, Chrysler, Jeep, and Dodge.  Major Automotive Companies, Inc. as Assignee on Behalf of Major Automotive Wholly-owned Subsidiary Dealerships (hereinafter, "Major Automotive") purchases new vehicles containing Automotive Wire Harnesses manufactured by Defendants and/or replacement parts for Automotive Wire Harnesses manufactured by Defendants.   Major Automotive purchased and received the Automotive Wire Harnesses and/or vehicles containing Automotive Wire Harnesses in New York.  Major Automotive has also displayed, sold, serviced,

and advertised its vehicles in New York during the Relevant Time Period. Accordingly, Major Automotive has been forced to pay Defendants' supra-competitive prices. Major Automotive, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

18.     Plaintiff Bronx Ford, Inc. is a Delaware corporation with its principal place of business in Bronx, New York. Bronx Ford, Inc. operates a dealership under the trade name City World Ford, formerly known as Bronx Ford Lincoln Mercury, Inc. and doing business as City World Ford Lincoln Mercury. The dealerships are (or have been) authorized dealers for at least the following: Ford and Lincoln. Bronx Ford purchases new vehicles containing Automotive Wire Harnesses manufactured by Defendants and/or replacement parts for Automotive Wire Harnesses manufactured by Defendants. Bronx Ford brings claims on behalf of its dealership located in New York. Bronx Ford has also displayed, sold, serviced, and advertised its vehicles in New York during the Relevant Time Period. Accordingly, Bronx Ford has been forced to pay Defendants' supra-competitive prices. Bronx Ford, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

19.     Plaintiff City World Motors, LLC is a Delaware corporation with its principal place of business in Bronx, New York. City World Motors, LLC operates a dealership under the trade name City World Toyota Scion. The dealership is (or has been) an authorized dealer for at least the following: Toyota and Scion. City World Motors, LLC (hereinafter, "City World Motors") purchases new vehicles containing Automotive Wire Harnesses manufactured by Defendants and/or replacement parts for Automotive Wire Harnesses manufactured by Defendants. City World Motors brings claims on behalf of its dealership located in New York. City World Motors has also displayed, sold, serviced, and advertised its vehicles in New York

during the Relevant Time Period. Accordingly, City World Motors has been forced to pay Defendants' supra-competitive prices. City World Motors, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

### b. Defendants

#### i. DENSO

20.     Defendant Denso Corp. is a Japanese corporation with its principal place of business in Kariya, Japan. Defendant Denso Corp. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

21.     Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corp. Defendant Denso International America, Inc. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese parent.

22.     Defendants Denso Corp., and Denso International America, Inc. are collectively referred to as "Denso."

#### ii. Yazaki

23.     Defendant Yazaki Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. Yazaki Corporation directly and/or through its subsidiaries, which it wholly owned and controlled, manufactured, marketed and/or sold Automotive Wire Harnesses

that were purchased throughout the United States, including in this district, during the Relevant Time Period.

24.    Defendant Yazaki North America, Inc. ("Yazaki North America") is an Illinois corporation and has its principal place of business in Canton Township, Michigan. It is a subsidiary of and owned and controlled by its parent, Yazaki Corporation.  Yazaki North America manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

25.    Defendants Yazaki Corporation and Yazaki North America, Inc. are collectively referred to as "Yazaki."

### iii.  Fujikura

26.    Defendant Fujikura, Ltd. is a Japanese company with its principal place of business in Tokyo, Japan.  Fujikura Ltd., directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

27.    Defendant Fujikura Automotive America LLC is a Delaware company headquartered in Novi, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Fujikura Ltd.  Fujikura Automotive America LLC manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese parent.

28.    Defendants Fujikura Ltd. and Fujikura Automotive America, LLC are collectively referred to as "Fujikura."

####    iv.  Furukawa

29.     Defendant Furukawa Electric is a Japanese corporation, with its principal place of business in Tokyo, Japan. Defendant Furukawa Electric, directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

30.     Defendant American Furukawa, Inc. ("American Furukawa") is a Delaware corporation, with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Furukawa Electric. Defendant American Furukawa manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese parent.

31.     Defendants Furukawa Electric and American Furukawa are collectively referred to as "Furukawa."

####    v.  Lear

32.     Defendant Lear Corporation is a Delaware corporation with its principal place of business in Southfield, Michigan. Co-conspirator Lear Corporation, directly or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

33.     Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware corporation with its principal place of business in Selma, Alabama.  It is a joint venture between

Lear Corporation and Kyungshin Corporation of South Korea. Co-conspirator Kyungshin-Lear Sales and Engineering, LLC manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.  Defendant Lear Corporation and Kyungshin-Lear Sales and Engineering, LLC are collectively referred to as "Lear."

34.     Defendant Lear Corporation filed for Chapter 11 bankruptcy protection on July 7, 2009. After their emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear Corporation continued to sell Automotive Wire Harnesses pursuant to and as part of its participation in furtherance of the conspiracy. From and after November 2009, Lear Corporation had significant Automotive Wire Harness sales in the United States at supra-competitive prices. In 2010 alone, Lear Corporation had $2.5593 billion in total sales in its electric power and management systems, which includes significant sales for Automotive Wire Harnesses in the United States pursuant to the alleged conspiracy.

### vi.  Leoni

35.     Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary or affiliate of and wholly owned and/or controlled by, Leoni Bordnetz Systeme Gmbh. Defendant Leoni Wiring Systems Inc. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

36.     Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG. Defendant Leonische manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district,

during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its German parent, Leoni AG.

37.     Defendants Leonische Holding, Inc. and Leoni Wiring Systems, Inc. are collectively referred to as "Leoni."

### vii.  Sumitomo

38.     Defendant Sumitomo Electric Industries, Ltd. ("Sumitomo Electric") is a Japanese corporation with its principal place of business in Osaka, Japan. Defendant Sumitomo Electric Industries, Ltd. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

39.     Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation, with its principal place of business in Yokkaichi, Japan. Defendant Sumitomo Wiring Systems, Ltd. has asserted that it is "proud to hold the world's top share in the automobile wiring harness field." Sumitomo Wiring Systems, Ltd. is a subsidiary of Sumitomo Electric Industries, Ltd. and is controlled by Sumitomo Electric Industries, Ltd. Defendant Sumitomo Wiring Systems, Ltd. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

40.     Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Electric Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United

States were under the control and direction of its Japanese joint venture participants.

41.     Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee. It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant K&S Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese parent.

42.     Defendant Sumitomo Wiring (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Wiring (U.S.A.) Inc. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

43.     Defendants Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc. and Sumitomo Wiring Systems (U.S.A.) Inc., are collectively referred to as "Sumitomo."

### viii.   Tokai Rika

44.     Defendant TRAM, Inc. ("TRAM") is a Michigan corporation with its principal place of business in Plymouth, Michigan. Defendant TRAM is a subsidiary of and controlled by Tokai Rika Co., Ltd. Defendant TRAM, Inc. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district,

during the Relevant Time Period.

45.     Defendant Tokai Rika Co., Ltd. is a Japanese company with its principal place of business in Niwa-gun, Japan. Defendant Tokai Rika Co., Ltd. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

46.     Defendants TRAM and Tokai Rika Co., Ltd. are collectively referred to as "Tokai Rika."

### ix.  G.S. Electech

47.     Defendant G.S. Electech, Inc. is a Japanese company with its principal place of business in Toyota City, Japan. Defendant G.S. Electech, Inc. manufactured, marketed and/or sold portions of Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

48.     Defendant G.S.W. Manufacturing, Inc. is an Ohio corporation, with its principal place of business in Findlay, Ohio. It is a subsidiary of and owned and controlled by its parent, G.S. Electech, Inc. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of its Japanese parent. Defendant G.S.W. Manufacturing, Inc. manufactured, marketed and/or sold portions of Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

49.     Defendants G.S. Electech, Inc. and G.S.W. Manufacturing, Inc. are collectively referred to as "G.S. Electech."

### x.  Mitsubishi

50.     Defendant Mitsubishi Electric Corporation is a Japanese corporation with its

principal place of business in Tokyo, Japan. Mitsubishi — directly and/or through its subsidiaries, which it wholly owned and/or controlled — manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this District, during the Relevant Time Period.

51.     Defendant Mitsubishi Electric US Holdings, Inc. is a Delaware corporation with its principal place of business in Cypress, California. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric Corporation. Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this District, during the Relevant Time Period.

52.     Defendant Mitsubishi Electric Automotive America, Inc. is a Delaware corporation with its principal place of business in Mason, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric US Holdings. Mitsubishi Electric Automotive America, Inc. manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this District, during the Relevant Time Period.

53.     Defendants Mitsubishi Electric Corporation, Mitsubishi Electric US Holdings, Inc., and Mitsubishi Electric Automotive America, Inc. are collectively referred to as "Mitsubishi."

### xi.  Asti Corporation

54.     Defendant Asti Corporation ("Asti") is a Japanese corporation with its principal place of business in Hamamatsu, Japan. Defendant Asti Corp. — directly and/or through its subsidiaries, which it wholly owned and/or controlled — manufactured, marketed and/or sold

Automotive Wire Harnesses that were installed in vehicles purchased throughout the United States, including in this district, during the Relevant Time Period.

### xii.  Chiyoda

55.     Defendant Chiyoda Manufacturing Corporation is a Japanese corporation with its principal place of business in Takamatsu, Japan. Chiyoda — directly and/or through its subsidiaries, which it wholly owned and/or controlled — manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

56.     Defendant Chiyoda USA Corporation is a Delaware corporation with its principal place of business in Greencastle, Indiana. It is a subsidiary of and wholly owned and/or controlled by its parent, Chiyoda Manufacturing Corporation. Chiyoda USA Corporation, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period. During the Relevant Time Period, Chiyoda USA's actions were under the direction and control of Chiyoda Manufacturing.

57.      Defendants Chiyoda Manufacturing Corporation and Chiyoda USA Corporation are collectively referred to as "Chiyoda."

### c.  Agents and Co-Conspirators

58.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

59.     Co-conspirator S-Y Systems Technologies Europe, GMBH, ("S-Y Systems Technologies") is a German corporation with its principal place of business in Regensburg, Germany. S-Y Systems Technologies is a joint venture between Yazaki Corporation and

Continental AG. During the Relevant Time Period, S-Y Systems Technologies was at least partially controlled by Yazaki Corporation. S-Y Systems Technologies, directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

60. Co-conspirator S-Y Systems Technologies, America, LLC, is a Delaware corporation, with its principal place of business in Dearborn, Michigan. It is currently a wholly owned subsidiary of and/or controlled by its parent Yazaki Corporation, having been purchased by Yazaki Corporation in 2005, before which time it was a joint venture between Siemens VDO Automotive AG and Yazaki Corporation and controlled by S-Y Systems Technologies Europe, GMBH. S-Y Systems Technologies, America, LLC manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period. At all times during the Relevant Time Period, its activities in the United States were under the control and direction of either S-Y Systems Technologies Europe, GMBH, or its current Japanese parent, Yazaki Corporation.

61. Co-conspirator Furukawa Wiring Systems, America, Inc. ("Furukawa Wiring") is a Delaware corporation with its principal place of business in El Paso, Texas. Furukawa Electric owns 60% of Furukawa Wiring's shares and American Furukawa owns 40%. Furukawa Wiring, operating under the names, Furukawa Lear Corporation and Lear Furukawa Corporation, was a joint venture, between Furukawa Electric and Lear Corporation. In 1987, Furukawa Electric and a Lear Corporation corporate predecessor began Furukawa Wiring as a joint venture to manufacture and sell wire harnesses to Japanese automobile manufacturers in North America. Lear held an 80% stake in the venture, with Furukawa holding the remaining 20%. In April

2009, Furukawa purchased an additional 60% of the joint venture, raising its stake to 80%, and changed the joint venture's name to Furukawa Lear Corporation. In June 2010, Furukawa Lear Corporation became a wholly owned subsidiary of Furukawa called Furukawa Wiring. Furukawa Wiring and its predecessors manufactured, marketed and/or sold Automotive Wire Harnesses that were purchased throughout the United States, including in this district, during the Relevant Time Period.

62.    On information and belief, additional persons and entities participated as co-conspirators with Defendants in the conspiracy and performed acts in furtherance of the conspiracy and anti-competitive conduct.   The identities of such persons and entities are currently unknown.

63.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## IV. PROCEDURAL HISTORY

64.    On August 25, 2016, the United States District Court for the Eastern District of Michigan preliminarily approved the proposed settlement of certain class claims against some of the Defendants for claims related to the antitrust conduct described herein related to Automotive Wire Harnesses.   This settlement was entered into as part of the "second group" of settlements that provide benefits to eligible automobile dealers.   *See* Exhibit E.   Plaintiffs did not opt-out of the "first group" of settlements that provide benefits to eligible automobile dealers related to the massive antitrust conspiracy to fix the prices of automotive parts.   However, as of the date of

filing this Complaint, Plaintiffs have still not received a single dollar or benefit for their claims that were settled as part of the "first group," which was received final approval on December 7, 2015.

65.     Pursuant to Rule 23, the Court ordered the parties in the class action to provide notice to the absent class members advising them of, among other things, their right to opt-out of any of the proposed settlements in the "second group."

66.     Plaintiffs properly exercised their right to opt out from the settlements related to all automotive parts in the "second group" including Automotive Wire Harnesses prior to the opt-out deadline provided in the notice.

67.     As set forth herein, Defendants engaged in a massive, anti-competitive conspiracy to raise the prices of Automotive Wire Harnesses above competitive levels.  As a result, Plaintiffs, who are automobile dealers, paid supra-competitive prices for Automotive Wire Harnesses and/or vehicles containing Automotive Wire Harnesses.  Defendants have caused Plaintiffs substantial antitrust injuries to their business and property.  As such, Plaintiffs now bring this action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, unjust enrichment and consumer protection laws, and demand a trial by jury.

## V.  FACTUAL ALLEGATIONS

### a.  The Automotive Wire Harness Market

68.     Automotive Wire Harnesses are installed both as original equipment from an automobile manufacturer ("OEM") and also as replacement parts when the systems become defective or damaged.  For new automobiles, OEMs purchase Automotive Wire Harnesses from parts suppliers such as Defendants.  OEMs may also purchase Automotive Wire Harnesses from

component manufacturers.

69.     When purchasing Automotive Wire Harnesses, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model specific parts.  Automotive parts suppliers submit quotations, or bids, to the OEMs in response to RFQs, and the OEMs award the business to the selected supplier for the lifespan of the model, which is usually four to six years.  Typically, the bidding process for a particular model begins approximately three years prior to the start of production. Defendants comprise the majority of auto parts suppliers who manufacture Automotive Wire Harnesses for sale to OEMs.

70.     Defendants and their co-conspirators supplied OEMs with Automotive Wire Harnesses both for new vehicles and as replacement parts for vehicles manufactured and/or sold in the United States.  Defendants and their co-conspirators manufactured Automotive Wire Harnesses in the United States and/or for installation in vehicles manufactured and sold in the United States.  Defendants and their co-conspirators also manufactured Automotive Wire Harnesses in Japan for export to the United States for installation in vehicles manufactured and sold in the United States and for installation in vehicles manufactured in Japan but exported to the United States for sale.

71.     Plaintiffs are automobile dealers and purchased new vehicles and/or replacement parts for vehicles from OEMs.  As a result, Plaintiffs indirectly purchased Automotive Wire Harnesses from one or more of Defendants.

72.     The global Automotive Wire Harness market has continued to increase in size.  It was estimated to be $21.9 billion USD in 2009.  It is expected to reach $54.2 billion by 2021.

73.     The global Automotive Wire Harness market is dominated by large manufacturers who control the vast majority of the market, including five of the Defendants.

74.     As of 2009, Yazaki controlled almost 30% of the global market for Automotive Wire Harnesses.  Approximately 77% of Yazaki's sales are from Automotive Wire Harnesses, and 37% of its 2007 sales were in the Western Hemisphere.  Yazaki's largest customers are Toyota, Chrysler, Ford, Renault-Nissan, Honda, and General Motors.  In the Western Hemisphere, Yazaki supplies Volvo, Chrysler, Ford, General Motors, Honda, Isuzu, Mazda, Mitsubishi, Nissan, Renault, Subaru, Suzuki and Toyota.

75.     Sumitomo is the second largest manufacturer of Automotive Wire Harnesses, and controls 24% of the global market.  Sumitomo supplies Volkswagen, Toyota, Honda and Nissan.

76.     Leoni controls 6% of the global market for Automotive Wire Harnesses.

77.     Lear controls almost 5% of the global market for Automotive Wire Harnesses. Lear supplies Toyota, General Motors, Ford, and BMW.

78.     Furukawa controls almost 4% of the global market for Automotive Wire Harnesses.

79.     Fujikura controls 2.69% of the global market for Automotive Wire Harnesses. Fujikura supplies Volkswagen and Subaru, among other OEMs.

80.     Defendant Asti claims that its customers for Automotive Wire Harnesses include Suzuki, Toyota, and Honda.

81.     Defendant Chiyoda USA Corporation states on its website that its customers for Automotive Wire Harnesses include Subaru of Indiana Automotive, Inc. and Ford Motor Company.

82.     Tokai Rika supplies Toyota, among other OEMs.

83.     S-Y Systems supplies Ford, among other OEMs.

84.     Cars manufactured by the above-described OEMs containing Automotive Wire

Harnesses are purchased by Plaintiffs in the United States.

85.    Defendants are the dominant suppliers of Automotive Wire Harnesses in the United States and throughout the world.

**b.  Defendants' Conspiracy and Anti-Competitive Conduct**

86.    The major costs for production of Automotive Wire Harnesses remained steady or decreased during the Relevant Time Period.  In a free and competitive market, that should lead to decreased prices of the product.  Competitors are able to lower their prices to try to capture more market share.  As such, prices go down as competitors do what they are supposed to do—compete.  When the market at issue is rigged by a conspiracy, however, this does not happen.

87.    Where competitors have conspired to fix prices and hinder competition, prices remain the same or even increase despite the competitors' costs remaining steady or even decreasing.  That is what happened with Automotive Wire Harnesses.  The price of Automotive Wire Harnesses increased during the Relevant Time Period, while the costs remained steady. With steady costs, Defendants should have lowered their prices for Automotive Wire Harnesses to compete with each other.  Because Defendants conspired to fix the prices of Automotive Wire Harnesses and not compete with each other, the steady costs of manufacture did not lower the overall prices for Automotive Wire Harnesses.

88.    Thus, Defendants' anti-competitive conspiracy and behavior have caused price increases for Plaintiffs.

89.    The nature of the Automotive Wire Harness Market in the United States is conducive to a price-fixing agreement, and has made collusion particularly attractive in this market.  Specifically, the Automotive Wire Harness market:  (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to

conspire.

90.     Where a group has entered into a conspiracy to raise prices above competitive levels for a particular market, new companies would seemingly use that as an opportunity to enter that market with more competitive pricing.  This is less likely to occur where there are significant barriers to entering the market at issue.

91.     Significant barriers to entry exist in the Automotive Wire Harness market.  First, a new company would face high start-up costs, including millions of dollar costs related to manufacturing plants, equipment, energy, transportation, distribution infrastructure, skilled labor and customer relationships.

92.     Moreover, OEMs cannot immediately swap out one Automotive Wire Harness for another.  An Automotive Wire Harness and vehicle are designed to integrate with one another. An OEM designs a vehicle to work with the specific Automotive Wire Harness that it will use for that vehicle, which must fit properly within the vehicle and integrate with the electronics, among other features, of the vehicle.  Any potential new manufacturer of an Automotive Wire Harness would likely be forced to wait to bid on future models of vehicles that an OEM has not already designed with a particular Automotive Wire Harness in mind.  This contributes to the high barrier to entering the Automotive Wire Harness market.

93.      Regarding inelasticity of demand, there is inelasticity of demand for Automotive Wire Harnesses.  "Elasticity is a measure of a variable's sensitivity to a change in another variable."[2]  Price elasticity of demand is "a measure of the relationship between a change in the quantity demanded of a particular good and a change in its price."[3]  "If a small change in price is

---

[2] http://www.investopedia.com/terms/e/elasticity.asp
[3] http://www.investopedia.com/terms/p/priceelasticity.asp

accompanied by a large change in quantity demanded, the produce is said to be elastic (or responsive to price changes).  Conversely, a product is inelastic if a large change in price is accompanied by a small amount of change in quantity demanded."[4]  Customers who have no cheaper alternative for a product with inelastic demand are forced to continue to purchase the product at higher prices.  Thus, inelastic demand in a market facilitates conspiring by allowing producers to raise their prices without fear of losing sales to other substitute products (or customers not buying the product at all).

94.     Demand for Automotive Wire Harnesses is highly inelastic.  No close substitute products exist.  Automotive Wire Harnesses are an essential part of every vehicle and must be purchased even if prices are raised.

95.     Regarding the concentration of the market, Defendants dominate the Automotive Wire Harness market as described above.  A highly concentrated market is more susceptible to collusion and other anti-competitive practices.

96.     Additionally, Defendant had ample opportunities to conspire.  Defendants attended industry events, including the annual North American International Auto Show ("NAIAS") in Detroit, Michigan, which provided the means and opportunity to further the conspiracy.  Defendants have also regularly attended the Automotive Aftermarket Products Expo in Las Vegas, Nevada.  Defendant Denso was a premier sponsor of the 2012 event, held January 9 to January 22.

### c. Government Investigations into Auto Parts Antitrust Violations

97.     As discussed above, government investigations into the rampant automotive parts industry antitrust conspiracies are well documented.  The DOJ continues to investigate the "price

---

[4] *Id.*

fixing, bid rigging and other anticompetitive conduct in the automotive parts industry…A total of 65 individuals and 47 companies have been charged in the Antitrust Division's investigations into the automotive parts industry."[5]   The DOJ has described the investigation as the largest criminal investigation it has ever undertaken.  The DOJ has thus far fined companies over $2.9 billion related to this investigation and sentenced dozens to jail terms.[6]

98.    Government investigations into the suppliers of Automotive Wire Harnesses originated in Europe after several European OEMs brought a complaint to the European Commission ("EC").  In February 2010 and in June 2010, the EC conducted raids on the offices of several defendants.  Also in February 2010, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of Furukawa Electric, Sumitomo Electric, and Yazaki Corporation, seeking evidence of collusion in the industry.  Finally, FBI investigators raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.

99.    On January 19, 2012, the JFTC issued Cease and Desist orders against Fukijura Ltd., and Yazaki Corporation, and fined Sumitomo Electric, Fujikura Ltd., and Yazaki Corporation based on bidding practices relating to Automotive Wire Harnesses.  According to the JFTC, Sumitomo Electric, Fujikura Ltd., and Yazaki Corporation all violated Japan's Antimonopoly Act by rigging bids to OEMs Toyota, Honda, Nissan, and Fuji (manufacturer of Subaru-brand vehicles) on wire harnesses and related products by appointing the designated successful bidder and managing to have the designated successful bidder win the bidding.  The JFTC stated that the conspiracy began as early as July 2000, and that Furukawa Electric also had participated in the bid-rigging conspiracy.

---

[5] https://www.justice.gov/opa/pr/auto-parts-industry-executive-pleads-guilty-obstruction-justice.
[6] https://www.law360.com/foodbeverage/articles/885906/trends-to-watch-in-doj-cartel-investigations-this-year.

100.    Several companies and their employees pleaded guilty.  Furukawa Electric and three of its executives pleaded guilty to conspiracy to rig bids, allocated customers, and fix prices of Automotive Wire Harnesses sold to automobile manufacturers in the United States and elsewhere.

101.    In January 2012, Yazaki Corporation and four of its executives agreed to plead guilty to conspiring to rig bids, fix prices, and allocate customers for Automotive Wire Harnesses, beginning in January 2000 through February 2010.

102.    In March 2012, DENSO pleaded guilty to antitrust violations relating to electronic control units.

103.    In April 2012, Fujikura, Inc. agreed to plead guilty to a conspiracy from January 2006 through February 2010.  G.S. Electech, Inc. also agreed to plead guilty to the same conduct involving speed sensor wire assemblies.  Also in April 2012, another executive of DENSO corporation agreed to plead guilty and to serve fourteen months in U.S. prison for his role in a conspiracy to fix prices and rig bids for heater control panels installed in U.S. automobiles.

104.    In June 2012, Autoliv Inc. agreed to plead guilty for its role in a conspiracy to fix prices of seatbelts, airbags and steering wheels installed in U.S. cars to one automobile manufacturer and a separate conspiracy to fix prices of seatbelts to another.  Additionally, another executive of Yazaki Corporation agreed to plead guilty for his role in a separate conspiracy to fix prices of automotive wire harnesses and related products installed in U.S. automobiles.

105.    In July 2012, TRW Deutschland Holding GmbH, a subsidiary of U.S.-based TRW Automotive Holdings Corp., agreed to plead guilty for its involvement in a conspiracy to fix prices of seatbelts, airbags and steering wheels sold to two German automobile manufacturers,

and installed in automobiles sold in the United States.

106.    In August 2012, another executive from Yazaki Corporation agreed to plead guilty for his role in a conspiracy to fix prices of instrument panel clusters, also known as meters, installed in automobiles sold in the United States and elsewhere.  Additionally, Nippon Seiki Co. Ltd. agreed to plead guilty for its role in a conspiracy to fix prices of instrument panel clusters installed in automobiles sold in the United States and elsewhere.

107.    In October 2012, Tokai Rika Co. Ltd. agreed to plead guilty for its role in a conspiracy to fix prices of heater control panels installed in automobiles sold in the United States and elsewhere and for obstruction of justice related to the investigation of the antitrust violation.

108.    In November 2012, an executive of the Ohio subsidiary of a Japanese automotive supplier pleaded guilty for his role in a conspiracy to fix prices and rig bids of anti-vibration rubber parts sold in the United States and elsewhere.

109.    In May 2013, two DENSO executives agreed to plead guilty for their roles in international conspiracies to fix prices and rig bids for automotive components including heater control panels and electronic control units.

110.    In July 2013, Diamond Electric Mfg. Co. Ltd. agreed to plead guilty for its role in a conspiracy to fix prices of ignition coils installed in automobiles sold in the United States and elsewhere.  Also in July, Panasonic Corp. and its subsidiary, SANYO Electric Co. Ltd. agreed to plead guilty for their roles in separate price-fixing conspiracies involving automotive parts including switches, steering angle sensors, automotive high intensity discharge ballasts, and battery cells.

111.    In September 2013, nine Japan-based companies and two executives agreed to plead guilty for their roles in separate conspiracies to fix the prices of more than thirty different

products sold to U.S. car manufacturers and installed in automobiles sold in the United States and elsewhere.

112.    In November 2013, three executives of Takata Corp. agreed to plead guilty for their participation in a conspiracy to fix prices of seatbelts installed in automobiles sold in the United States.  Also in November, Toyo Tire & Rubber Co. Ltd. agreed to plead guilty for its role in two separate conspiracies to fix the prices of automotive components involving anti-vibration rubber and driveshaft parts installed in automobiles in the United States and elsewhere. Also in November, Stanley Electric Co. Ltd. agreed to plead guilty for its participation in a conspiracy to fix prices of lamp ballasts installed in automobiles sold in the United States and elsewhere.

113.    In January 2014, Koito Manufacturing Co. Ltd. agreed to plead guilty for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and lamp ballasts installed in automobiles sold in the United States and elsewhere.  Also in January, the former president and vice president of Diamond Electric Mfg. Co. Ltd. agreed to plead guilty for their participation in a global conspiracy to fix prices of ignition coils installed in automobiles sold in the United States and elsewhere.

114.    In February 2014, Aisan Industry Co. Ltd., agreed to plead guilty for its role in a price-fixing conspiracy involving electronic throttle bodies sold in the United States and elsewhere.  Also in February, Bridgestone Corp. agreed to plead guilty for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.  Two months later, in April 2014, a former executive from Bridgestone Corp. agreed to plead guilty for his role in the conspiracy.

115.    In June 2014, an executive of DENSO agreed to plead guilty for his role in a

conspiracy to fix the prices of instrument panel clusters installed in automobiles sold in the United States and elsewhere.

116.    In August 2014, NGK Spark Plug Co. Ltd agreed to plead guilty for its role in a conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in automobiles sold in the United States and elsewhere.

117.    In September 2014, Toyoda Gosei Co. Ltd. agreed to plead guilty for its role in conspiracies to fix prices and rig bids for automotive hoses, airbags and steering wheels sold to automobile manufacturers.

118.    In October 2014, Hitachi Metals Ltd. agreed to plead guilty for its role in a conspiracy to fix prices and rig bids for automotive brake hoses installed in automobiles sold in the United States and elsewhere.

119.    In November 2014, Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty for their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United states.

120.    In December 2014, an executive of T.RAD Co. Ltd. agreed to plead guilty for participating in a conspiracy to fix prices of radiators installed in automobiles sold in the United States and elsewhere.  Also in December 2014, a former executive of Mitsuba Corporation agreed to plead guilty for conspiring to fix the prices of windshield wiper systems and start motors installed in automobiles sold in the United States and elsewhere.

121.    In January 2015, a former executive of Toyoda Gosei Co. Ltd. agreed to plead guilty for his role in a conspiracy to fix prices and rig bids of automotive hoses installed in automobiles sold in the United States.

122.    The sprawling number of indictments and guilty pleas related to the global

conspiracy to rig bids and fix prices of various automotive parts is shocking.

### VI. COMPETITIVE INJURY

123.    Defendants' conspiracy has harmed each Plaintiff.   The cost of new vehicles containing Automotive Wire Harnesses and replacement parts are supra-competitive because of Defendant's conduct.   But for Defendants' conspiracy, automobile dealers, including Plaintiffs, would not have paid such supra-competitive, artificially inflated prices.   Absent the supra-competitive prices, Plaintiffs would be able to gain the benefits of competition as to Automotive Wire Harnesses (both in new vehicles and as replacement parts), which would reduce the prices to a competitive level.   Plaintiffs purchased new vehicles containing Automotive Wire Harnesses and/or Automotive Wire Harnesses as replacement parts from OEMs who had purchased the Automotive Wire Harnesses from Defendants.   Thus, Plaintiffs paid higher prices for new vehicles containing Automotive Wire Harnesses and replacement Automotive Wire Harnesses than they otherwise would have paid absent Defendant's conspiracy and conduct.

124.    Each Plaintiff absorbed a substantial portion of the overcharges that they paid due to Defendants' illegal activities.   Plaintiffs did not pass on all overcharges caused by Defendants' illegal activities.

125.    Automotive Wire Harnesses are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.   As a result, Automotive Wire Harnesses follow a traceable physical chain of distribution from Defendants to Plaintiffs, and any costs attributable to Automotive Wire Harnesses can be traced through the chain of distribution to Plaintiffs.

126.    The market for Automotive Wire Harnesses and the market for vehicles are inextricably linked and intertwined because the market for Automotive Wire Harnesses exists to

serve the vehicle market (either within new vehicles or as replacement parts for vehicles). Without the vehicles, the Automotive Wire Harnesses have little to no value. The demand for vehicles creates the demand for Automotive Wire Harnesses.

127. Defendants' conspiracy restrained competition in the United States, including in all states that permit the recovery of damages by indirect purchasers, and had substantial effects on the commerce of the United States.

## VII.   DISCOVERY RULE AND FRAUDULENT CONCEALMENT

128. Plaintiffs had no knowledge of Defendants' conduct and conspiracy, as alleged herein, and had no reason to know of such conduct until the public announcements of Furukawa's agreement to plead guilty to participating in the Automotive Wire Harness conspiracy. Plaintiffs had no knowledge or reason to know of the existence of the conspiracy prior to that date. Plaintiffs are automobile dealers who had no direct contact or interaction with any of Defendants and no means to discover the conspiracy. Further, even by that date, Plaintiffs had no way of discovering the extent of the conspiracy or the number of companies involved until further guilty pleas were made public.

129. Defendants further took affirmative steps to conceal their misconduct. Defendants kept their agreements, understandings and conspiracies secret. A price-fixing conspiracy such as this one is, by its very nature, secretive. As explained in the informations filed against several Defendants, the conspirators concealed their activities from the authorities by using code names and arranging meetings at private residences and remote locations.

130. Plaintiffs could not have discovered the alleged conspiracy and conduct at an earlier date by the exercise of reasonable diligence.

131. Thus, the discovery rule and Defendants' fraudulent concealment have tolled the

running of any applicable statutes of limitations.

132.   Any applicable statutes of limitations as to Plaintiffs have been further tolled by the pending class actions.

## VIII.   CLAIMS

### a.   Count 1 – Violation of Section 1 of the Sherman Act

133.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

134.   Defendants and unnamed conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

135.   The acts done by each of Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

136.   At least as early as January 1999, and continuing through at least the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to rig bids for and to artificially fix, raise, stabilize and control prices for Automotive Wire Harnesses thereby creating anticompetitive effects.

137.   The anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harnesses and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Wire Harnesses throughout the United States.

138.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Wire Harnesses.

139.   As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs have been harmed by purchasing Automotive Wire Harnesses or vehicles containing Automotive Wire Harnesses manufactured by Defendants or their co-conspirators by being forced to pay inflated, supra-competitive prices for such products.

140.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and courses of conduct set forth herein.

141.   Defendants' conspiracy had the following effects, among others:

    a.   Price competition in the market for Automotive Wire Harnesses has been restrained, suppressed and/or eliminated in the United States;

    b.   Prices for Automotive Wire Harnesses sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

    c.   Plaintiffs who purchased Automotive Wire Harnesses, or vehicles containing Automotive Wire Harnesses manufactured by Defendants and their co-conspirators have been deprived of the benefits of free and open competition and have been forced to pay artificially inflated prices for such products.

142.   Plaintiffs have been injured and will continue to be injured in their business and property by paying more for Automotive Wire Harnesses or vehicles containing Automotive Wire Harnesses manufactured by Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

143.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

144.   Plaintiffs are entitled to an injunction against Defendants, pursuant to 15 U.S.C. §26, preventing and restraining the violations alleged herein.

### b. Count 2 – Violation of State Antitrust and Consumer Protection Statutes

145.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

146.   From as early as January 1999 through at least the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Wire Harnesses in an unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

147.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supra-competitive prices for Automotive Wire Harnesses and to allocate customers for Automotive Wire Harnesses in the United States.

148.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

  a.  Participating in meetings and conversations among themselves during which they agreed to price Automotive Wire Harnesses at certain levels and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs with respect to Automotive Wire Harnesses sold in the United States;

  b.  Allocating customers and markets and rigging bids for Automotive Wire Harnesses in the United States in furtherance of their agreements; and

  c.  Participating in meetings and conversations among themselves to implement, adhere to and police the unlawful agreements they reached.

149.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices, to rig bids and to allocate customers with respect to Automotive Wire Harnesses.

150.   The anti-competitive acts were intentionally directed at the market for Automotive Wire Harnesses in all states in which Plaintiffs do business allowing indirect

purchasers to collect damages and had a substantial and foreseeable effect on intrastate commerce by raising and fixing prices for Automotive Wire Harnesses throughout those states.

151.   Plaintiffs were deprived of free and open competition in all states, including all states in which Plaintiffs do business allowing indirect purchasers to collect damages, and Plaintiffs paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses in all states in which Plaintiffs do business allowing indirect purchasers to collect damages.

152.   Defendants' anticompetitive, unfair acts described above were knowing, willful and constitute flagrant violations of the below-listed state antitrust and consumer protection statutes.

153.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

a.   Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1)   Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Automotive Wire Harnesses prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses .

b.   During the Relevant Time Period, Defendants' illegal conduct substantially affected Arizona commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with

further injury.

d.  By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

154.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, §4-88-107(a)(10).

a.  Defendants knowingly agreed to, and did in fact act in, restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Wire Harnesses were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs.

b.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c.  Defendants' unlawful conduct had the following effects: (1) Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Automotive Wire Harnesses prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses.

d.  During the Relevant Time Period, Defendants' illegal conduct substantially

affected Arkansas commerce and consumers.

e.  As a direct and proximate result of the unlawful conduct of Defendants, have been injured in their business and property and are threatened with further injury.

f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs seek all relief available under that statute.

155.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§16700, *et seq.* and §§17200 *et seq.*

a.  During the Relevant Time Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

b.  During the Relevant Time Period, Defendants' illegal conduct substantially affected California commerce and consumers.

c.  This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

d.  Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of

conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

e.   Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

f.   Defendants' acts or practices are unfair to purchasers of Automotive Wire Harnesses (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

g.   Defendants' unlawful conduct had the following effects: (1) Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout California; (2) Automotive Wire Harnesses prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs, including those who resided in California and/ or purchased Automotive Wire Harnesses or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs, including those who resided in California and/or purchased Automotive Wire Harnesses or vehicles in California, paid supra-competitive,

artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses, including in California.

h.  Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

i.  Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

j.  The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

k.  As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

156.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201, *et seq.*

a.  Defendants' unlawful conduct had the following effects: (1) Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout Florida; (2) Automotive Wire Harnesses prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs were deprived of free and open petition; (4) Plaintiffs paid supra-

competitive, artificially inflated prices for Automotive Wire Harnesses.

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected Florida commerce and purchasers of Automotive Wire Harnesses and vehicles in Florida.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs seek all relief available under that statute.

157. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

a. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Wire Harnesses' price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Wire Harnesses  prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses.

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected Kansas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with

further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

158.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

a.  Defendants 'and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Wire Harnesses  price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Automotive Wire Harnesses  prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs, including those who resided in Mississippi and/or purchased Automotive Wire Harnesses  or vehicles in Mississippi, were deprived of free and open competition, including in Mississippi, and (4) Plaintiffs, including those who resided in Mississippi and/or purchased Automotive Wire Harnesses  or vehicles in Mississippi, paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses , including in Mississippi.

b.  During the Relevant Time Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

159. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

a. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Automotive Wire Harnesses prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses .

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

160.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

      a. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Wire Harnesses  price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Wire Harnesses  prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses  and vehicles containing Automotive Wire Harnesses .

      b. During the Relevant Time Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

      c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

      d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

161.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

      a. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Wire Harnesses price competition was

restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Wire Harnesses prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses.

b.  During the Relevant Time Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Accordingly, Plaintiffs seek all relief available under New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

162.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

a.  Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Wire Harnesses prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs, including those who resided in New York and/or purchased Automotive Wire Harnesses or

vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs, including those who resided in New York and/or purchased Automotive Wire Harnesses or vehicles in New York, paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses when they purchased, including in New York, Automotive Wire Harnesses or vehicles containing Automotive Wire Harnesses, or purchased vehicles and Automotive Wire Harnesses that were otherwise of lower quality than they would have been absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase Automotive Wire Harnesses or vehicles that they would have otherwise have purchased absent the illegal conduct.

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected New York commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

a. Defendants' and their co-conspirators' combinations or conspiracies had the

following effects: (1) Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Wire Harnesses prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs, including those who resided in North Carolina and/or purchased Automotive Wire Harnesses or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs, including those who resided in North Carolina and/or purchased Automotive Wire Harnesses or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses, including in North Carolina.

b. During the Relevant Time Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq*. Accordingly, Plaintiffs seek all relief available under North Carolina General Statutes §§ 75-1, *et seq.*

164.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705*, et seq.*

a. Defendants' and their co-conspirators' combinations or conspiracies had the

following effects: (1) Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout Oregon (2) Automotive Wire Harnesses prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses.

b.   During the Relevant Time Period, Defendants' illegal conduct substantially affected Oregon commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

165.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

a.   Defendants' combinations or conspiracies had the following effects: (1) Automotive Wire Harnesses price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Automotive Wire Harnesses prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs were deprived of free and open

competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for Automotive Wire Harnesses and vehicles containing Automotive Wire Harnesses.

b.   During the Relevant Time Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, et seq., and, accordingly, Plaintiffs seek all relief available under that statute.

166.   Specifically, Plaintiff Group 1 Automotive brings claims pursuant to the state statutes as set forth above against Defendants for the following states: California, Florida, Kansas, Mississippi, New Hampshire, New Mexico, New York, and South Carolina.

167.   Plaintiff Asbury Automotive brings claims pursuant to the state statutes as set forth above against Defendants for the following states: Arkansas, California, Florida, Mississippi, North Carolina, Oregon, South Carolina.

168.   Plaintiff VTG Automotive brings claims pursuant to the state statutes as set forth above against Defendants for the following states: Arizona, Florida, California, Nebraska, New Mexico.

169.   Plaintiffs Major Automotive, City World Motors, and Bronx Ford bring claims pursuant to the New York statutes set forth above against Defendants.

170.   Plaintiffs, having purchased new automobiles containing Automotive Wire

Harnesses and/or replacement parts for Automotive Wire Harnesses in the above states, as set forth in Paragraphs 166-69 *supra* have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs have paid more for Automotive Wire Harnesses or vehicles containing Automotive Wire Harnesses than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from Defendants' unlawful conduct.

171.    Defendants' violations of the above-listed state laws, as set forth in Paragraphs 166-69 *supra* have proximately caused the injuries sustained by Plaintiffs.

172.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct some at the expense and detriment of Plaintiffs.

173.    Accordingly, Plaintiffs seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust or consumer protection law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**c.  Count 3 – Unjust Enrichment**

174.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

175.    Plaintiffs Group 1 Automotive, Asbury Automotive, and VTG bring this claim under the laws of all states listed in Paragraph 166-69 respectively *supra*, except California. Plaintiff Group 1 Automotive also brings this claim under the laws of Massachusetts.  Plaintiff Asbury Automotive also brings this claim under the laws of Missouri.  Plaintiff VTG also brings this claim under the laws of Missouri and Illinois.

176.    Plaintiffs Major Automotive, City World Motors, and Bronx Ford bring this claim under the laws of New York.

177.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Wire Harnesses.

178.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs for Automotive Wire Harnesses.

179.     Plaintiffs are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

180.    Pursuit of any remedies against the OEMs from whom Plaintiffs purchased vehicles containing Automotive Wire Harnesses and Automotive Wire Harnesses as replacement parts would have been futile, given that those OEMs did not take part in Defendants' conspiracy.

## IX. DEMAND FOR JURY TRIAL

181.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand that, at the trial of this cause, a jury be empaneled to determine all disputed issues of fact.

## X.  PRAYER

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

1.  Judgment in favor of each Plaintiff and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

2. An award of the cost of the suit, including a reasonable attorney's fee; and

3. Such other and further relief as the Court deems just, equitable, and proper.

DATED:  June 23, 2017                              Respectfully submitted,

/s/ Andrew G. Pate_____
Michael B. Angelovich
Texas Bar No. 00785666
Jeffrey J. Angelovich
Texas Bar No. 00786988
Andrew G. Pate
Texas Bar No. 24079111
**NIX, PATTERSON & ROACH, LLP**
3600 N. Capital of Texas Hwy.
Bldg. B, Suite 350
Austin, TX  78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335
Email:  mangelovich@nixlaw.com
jangelovich@nixlaw.com
dpate@nixlaw.com


Winn Cutler
Texas Bar No. 24084364
**NIX, PATTERSON & ROACH, LLP**
Advancial Building
1845 Woodall Rodgers Fwy.
Suite 1050
Dallas, TX  75201
Telephone: (972) 831-1188
Facsimile: (972) 444-0716
Email: winncutler@nixlaw.com

Keith Butler
California Bar No. 215670
**STRANGE & BUTLER LLP**
12100 Wilshire Blvd.
Suite 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
Facsimile: (310) 826-3210
Email: kbutler@strangeandbutler.com

**ATTORNEYS FOR PLAINTIFFS**